IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

CEDRIC C. STEWART                                        PLAINTIFF

v.                               CIVIL ACTION NO. 4:19-CV-00120-GHD-JMV

OFFICER JEREMY MATHEWS, ET AL.                          DEFENDANT

OPINION GRANTING DEFENDANT HOLLIS MYRICK'S MOTION FOR SUMMARY
JUDGMENT

Presently before the Court is Defendant Hollis Myrick's Motion for Summary Judgment
[70], in response to Plaintiff Cedric C. Stewart's Complaint alleging violations of his rights secured
by the Fourth Amendment and 42 U.S.C. § 1983 [1, at 11-12]. For the reasons stated herein, the
Motion is granted.

I.      **Factual and Procedural Background**

The Plaintiff is a resident of Grenada, Mississippi [1, at ¶ 5]. Defendant Jeremy Mathews
is employed as a police officer for the City of Grenada Police Department [*Id.*, at ¶ 6]. Defendant
Hollis Myrick is also employed as a police officer for the City of Grenada Police Department [*Id.*,
at ¶ 7], as is Defendant John Doe, whom the Plaintiff has yet to identify [*Id.*, at ¶ 8].

The facts, as alleged by the Plaintiff, are as follows. On March 31, 2018, at approximately
7:00-8:00 PM, the Plaintiff was listening to music in the garage of his house, which is located at
771 West Govan Street in Grenada [*Id.*, at ¶ 11; 75-1, at 80]. At least three other men were present
at the scene: Jimmy Stewart, Kenneth Haywood, and Stanley Stewart [70-3, at 3-7; 75-1, at 97-
100]. These men are the Plaintiff's uncle and cousins [*Id.*]. A fourth person, identified as Mr.
Ernest, was also present at the scene [70-3, at 13; 75-1, at 108, 116]. The men were outside the
garage grilling hamburgers and ribs while listening to music [70-3, at 6-7; 75-1 at 106, 109]. At
around 9 p.m. that evening, Defendant Doe, an unknown police officer, arrived at the scene and

1

told the Plaintiff that a neighbor had complained about the volume of the music [1, at ¶ 12; 70-3, at 8-10; 75-1, at 111-13]. Without getting out of his car, he asked the Plaintiff to turn down the music [*Id.*]. The Plaintiff complied with this request, and lowered the volume of the music [1, at ¶ 13; 70-3, at 11; 75-1, at 114]. Defendant Doe then left the scene [1, at ¶ 13; 70-3, at 12; 75-1, at 115]. At approximately 10:45 PM, a police officer—believed by the Plaintiff to be Defendant Doe, the same officer who visited the house earlier in the evening—arrived at the scene and told the Plaintiff that he had returned because of complaints regarding the volume of the music [*Id.*, at ¶ 14; 70-3, at 13; 75-1, at 116]. He then asked the Plaintiff for his identification [*Id.*, at ¶ 15; 70-3, at 16; 75-1, at 119, 121]. The Plaintiff turned toward his vehicle to retrieve his identification, and then turned back to face Defendant Doe once he had reached his vehicle [1, at ¶ 16; 70-3, at 16; 75-1, at 119]. The vehicle was parked in a darkened area on the street [70-3, at 39-40; 75-1, 180-81]. According to the Plaintiff, it was only then that he became aware that Defendant Mathews and Defendant Myrick were "coming up behind him" [1, at ¶ 16]. The Plaintiff stated that he was unaware of Defendant Mathews' and Defendant Myrick's presence at the scene, and had not seen them up until this point [75-1, at 121], and that he only became aware of their presence as he turned around to face Defendant Doe and only a moment before Defendant Mathews discharged his taser gun at the Plaintiff [75-1, at 121-22]. To be clear, the Plaintiff stated under oath in a deposition that he never refused to give his identification to any police officer [70-3, at 18; 75-1, at 122], and that he indicated his assent to retrieve his identification from his truck through "body language" [70-3, at 19; 75-1, at 123]. He also stated that he never opened the truck's door, or even touch the door handle [70-3, at 20; 75-1, at 124]. Likewise, he stated that neither of the Defendants spoke with him before he was tased, and that no one told him to stop or not to open the truck's door [70-3, at 20; 75-1, at 124]. He also stated under oath that he never disobeyed any of the officers, never

2

"smarted off" to any of the officers, and never resisted any of them [75-1, at 138-39]. Likewise, the Plaintiff stated that none of the officers touched him before he was tased [75-1, at 139]. The Plaintiff stated that, after arriving at his truck but before touching it, he turned around to face the police officer who asked for his license, and then was suddenly tased when he turned around [70-3, at 19-21; 75-1, at 123-25].

The Plaintiff stated in his Complaint that, with neither warning nor provocation, Defendant Mathews used his taser gun on the Plaintiff twice, and that this caused the Plaintiff to collapse to the ground in pain [1, at ¶ 17]. He made a similar statement under oath during his deposition [70-3, at 21; 75-1, at 125]. The Plaintiff stated that the amount of time between the two uses of the taser was less than two seconds; in his words, "[t]hat first one didn't affect [him] because [he] was already prepared. A second and a half later, it was boom, boom. Just like that." [70-3, at 22; 75-1, at 126]. The Grenada Police Department Taser Exposure Report indicates that the Plaintiff was exposed to two taser cycles of five seconds each, for a total of ten seconds of taser exposure [70-7]. The Plaintiff characterized the event by saying that "it happened so fast" [70-3, at 32; 75-1, at 145]. In light of the speed in which the event occurred, the Plaintiff was asked in a deposition how Defendant Myrick could have prevented Defendant Mathews' actions [70-3, at 31; 75-1, at 144]. The Plaintiff responded, "I don't know. That's not my line of work," and only offered a conclusory statement that the event "should have been prevented" [*Id.*]. He likewise failed to offer an explanation as to how Defendant Myrick could have prevented it, given the narrow timeframe and Defendant Myrick's stated lack of knowledge about Defendant Mathews' sudden and unilateral decision to deploy the taser [*Id.*]. Furthermore, the Plaintiff does not contest that he was playing his music loudly, and that he believed that he was going to receive a ticket for doing so [75-1, at 148-49]. In an affidavit, the Plaintiff stated that he was not combative with officers; did not refuse

to produce identification; did not refuse to comply with officers' orders; did not immediately become hostile when asked for identification; did not slam his truck's door or even open the door; did not walk toward officers while stating, "I'm not going to give you anything" and "you can leave my house"; did not violently jerk away from Defendant Myrick or any other officer; and did not take a fighting stance, as if to strike an officer [75-4]. He likewise stated in the affidavit that Defendant Mathews did not yell, "Taser, taser, taser" [*Id.*].

The Plaintiff further stated in his Complaint and depositional testimony that Defendant Mathews then stepped on the back of the Plaintiff's knee and pressed his knee against the concrete, causing the Plaintiff's skin to break [1, at ¶ 18; 70-3, at 23-26; 75-1, at 127-30], and had his forearm on the Plaintiff's back while the Plaintiff lied on the ground face-down [70-3, at 25-26; 75-1, at 129-30]. The Plaintiff also stated that he was then cuffed, and left lying on the ground for 10-15 minutes until an ambulance called by the Defendants arrived at the scene [70-3, at 26; 75-1, at 130]. After a brief conversation with the Plaintiff, the medical professional with the ambulance determined that it was fine for the Plaintiff to ride in the police car [70-3, at 28; 75-1, at 132].

Defendant Mathews then arrested the Plaintiff, and charged him with Disorderly Conduct-Failure to Comply and Resisting Arrest [1, at ¶ 19; 70-8]. The Plaintiff has alleged that Defendant Mathews told him that he was under arrest for a single criminal charge, but later added the Resisting Arrest charge after realizing that the Plaintiff had no criminal record [1, at ¶ 19]. He has presented no evidence to support this contention. The Plaintiff has further alleged that Defendant Mathews falsely claimed that the Plaintiff was "scuffling and physically resisting" Defendant Myrick [*Id.*]. The Plaintiff stated that he never displayed any illegal, threatening, or aggressive behavior, and was not a threat to the Defendants [*Id.*, at ¶ 24]. Both of the charges were dismissed on October 2, 2018 [1, at ¶ 20].

4

In his Complaint, the Plaintiff has alleged four specific Counts: a Fourth Amendment excessive force claim under 42 U.S.C. § 1983 against Defendant Mathews; a Fourth Amendment unlawful arrest claim under 42 U.S.C. § 1983 against Defendant Mathews; a Fourth Amendment malicious prosecution claim under 42 U.S.C. § 1983 against Defendant Mathews; and a Fourth Amendment failure to intervene claim under 42 U.S.C. § 1983 against Defendants Myrick and Doe. The Defendants filed their Answer on February 14, 2020 [21].

Defendant Myrick filed the Motion for Summary Judgment *sub judice* on April 14, 2021. In the motion and its corresponding documents and memorandum brief, Defendant Myrick laid out his rendition of the relevant facts and claims, which are as follows [71]. On March 31, 2018, at approximately 7:38 p.m., the Grenada Police Department received a call regarding loud music coming from the house at the corner of Pine Street and Govan Street [71, at 1-2]. Officer Travis Nichols arrived at the scene, and advised the Plaintiff to turn down the music [*Id.*, at 2]. It was observed that the Plaintiff was having a family get-together, and was playing music in his garage through a surround sound system while grilling out back behind the garage [*Id.*]. The Plaintiff allegedly turned down the music [*Id.*]. At around 11:04 p.m., the Grenada Police Department received a second call complaining about loud music from the same house [*Id.*; 70-4, at 2]. The Defendants separately arrived at the scene around 11:10 p.m., and heard music once they arrived [71, at 1-2; 75-5, at 40-41]. The Defendants determined that the music was coming from the garage, which had its door open and lights turned off [71, at 1-2; 75-5, at 42]. In a deposition, Defendant Myrick stated that as he and Defendant Mathews approached the garage, the door came down, the music stopped, and two men "bolted from the back of the house" [75-5, at 45].

Defendant Myrick stated that he asked the men, identified as the Plaintiff and the Plaintiff's cousin, Kenneth Haywood, for identification [71, at 3; 75-5, at 47-49]. When asked for

identification, the Plaintiff allegedly acted belligerently toward the Defendants, and refused to give his identification to the Defendants [71, at 3-4; 75-5, at 51]. Defendant Myrick stated during depositional testimony that the Plaintiff "was giving [the Defendants] a lot of feedback" and "was mouthing" them while pacing back and forth [75-5, at 52]. He also allegedly said several times "Y'all don't have to be at my f---king house" and "I don't want y'all here" [71, at 3-4; 75-5, at 52]. The Plaintiff allegedly pulled out his wallet but failed to produce identification [71, at 4; 75-5, at 55-56]. The Defendants allegedly told the Defendant that they only needed to see the Plaintiff's identification, and that they would then be on their way [71, at 4; 75-5, at 57]. The Plaintiff then allegedly started to walk toward his truck, and after further questioning from the Defendants, told them that his ID was in the vehicle [71, at 4; 75-5, at 57]. The truck was parked in a darkened area [71, at 4; 75-5, at 43]. According to Defendant Myrick, up until this point he had been speaking with the Plaintiff and that at this point Defendant Mathews started to speak with the Plaintiff [75-5, at 58]. The Plaintiff allegedly opened the door to his truck, looked inside the truck, stepped inside the vehicle, then got out, and slammed the door shut [71, at 4; 75-5, at 58]. He still failed to produce identification [71, at 4]. Defendant Myrick stated that the officers told the Plaintiff, "Stop. Talk to us," but that nothing physical had occurred up until that point [75-5; at 59]. He alleged that the Plaintiff "continued to ignore the officers' commands" [71, at 4]. After the Plaintiff returned from his vehicle, Defendant Myrick's attention was on the other then-unidentified person at the scene, now identified as Kenneth Haywood, while Defendant Mathews was talking to the Plaintiff [75-5, at 60]. According to Defendant Myrick, the Plaintiff then walked toward him, saying, "I'm not going to give you anything" and "You can leave my house" [71, at 4; 75-5, at 62]. Defendant Myrick stated that when he "reached out to touch his shoulder, [the Plaintiff] violently jerked away and took an 'aggressive stance' like he would hit [Defendant] Myrick" [71, at 4; 75-5, at 62-63, 66]. Defendant Myrick stated that at this point he heard Defendant Mathews tell him to step aside [71, at 4; 75-5, at 63]. Defendant Mathews then said, "Taser,

6

taser, taser," and proceeded to use his taser on the Plaintiff [71, at 4; 75-5, at 63]. Defendant Myrick stated that he was unaware of Defendant Mathews' second use of the taser at that time [71, at 4]; even during depositional testimony, Defendant Myrick stated that he believed that Defendant Mathews only tased the Plaintiff once [75-5, at 72-73]. According to Defendant Myrick, the use of the taser occurred within one or two seconds of Defendant Mathews' warning [75-5, at 68-70, 73]. During this time, Defendant Myrick was focused on Kenneth Haywood, and "making sure [he] wasn't a threat" [75-5, at 73]. Once the Plaintiff was subdued, Defendant Mathews arrested him [71, at 4; 70-8]. Defendant Myrick agrees with the Plaintiff that an ambulance was then called, and that the Plaintiff was cleared to be taken to jail [*Id.*]. The Plaintiff was taken to jail, and was bonded out about an hour later [*Id.*; 70-3, at 26-28]. The Plaintiff was charged, [71, at 4-5; 70-8], and the charges were dismissed on October 9, 2018, with his bond refunded to him [71, at 5; 70-9]. In support of his version of the event, Defendant Myrick provided two official statements regarding the event, one drafted the night of the event and the other drafted a few days later [70-6; 75-5, at 28-29, 106], the Taser Exposure Report drafted by Defendant Mathews [70-7], and the Arrest Report [70-8]. These documents align with Defendant Myrick's rendition of the event.

It is worth noting that neither the Plaintiff nor Defendant Myrick has been able to locate Defendant Mathews [71, at 5]. Similarly, the Motion for Summary Judgment *sub judice* pertains only to the conduct of Defendant Officer Myrick [70]. The Plaintiff claims that Defendant Myrick violated his Fourth Amendment rights by failing to intervene in Defendant Mathews' arrest of the Plaintiff and the alleged infliction of excessive force committed by Defendant Mathews against the Plaintiff [1, at ¶¶ 71-73]. The Plaintiff further alleges that Defendant Myrick had the "ability, opportunity, and obligation to prevent" Defendant Mathews' allegedly unlawful actions [*Id.*, at ¶ 72]. Defendant Officer Myrick filed his Motion for Summary Judgment on April 14, 2021 [70]. The Plaintiff filed his Response in Opposition to Defendant Myrick's Motion for Summary Judgment on April 28, 2021 [75].

Defendant Myrick filed his Reply in Support of his Motion for Summary Judgment on May 11, 2021 [82]. The matter is now ready for review.

## II.  Legal Standard

### A.  Summary Judgment

Summary judgment is warranted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). This rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The party moving for summary judgment bears the burden of identifying its basis for the motion, and must point to specific parts of the record that support its contention of an absence of a genuine dispute of material fact. *Id.* at 323.

After the moving party does so, the burden shifts to the non-moving party, which must "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). When there is a dispute about the facts, the Court must view the facts in the light most favorable to the non-moving party and likewise must draw reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, 490 F.App'x 666, 667 (5th Cir. 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d

312, 319 (5th Cir. 2007)).

Any claim that is not raised in a response to a defendant's motion for summary judgment is deemed to be waived. *Aldrup v. Caldera*, 274 F.3d 282, 288 (5th Cir. 2001). Moreover, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citing *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas*, 136 F.3d at 458. That said, summary judgment "must be used cautiously or it may lead to drastic and lethal results." *Murrell v. Bennett*, 615 F.2d 306, 309 (5th Cir. 1980).

## B. The Fourth Amendment, Qualified Immunity, 42 U.S.C. 1983, Excessive Force, and Bystander Liability

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' An arrest, of course, qualifies as a 'seizure' of a 'person' under this provision, and so must be reasonable under the circumstances." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735-736 (2011) (quoting *Dunaway v. New York*, 442 U.S. 200 (1979)). "In claims against state officials under 42 U.S.C. § 1983, the official may raise the affirmative defense of qualified immunity. The plaintiff has the burden to negate the defense of qualified immunity where, as here, it is properly raised." *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) (citing *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). In such cases, the plaintiff "must plead specific facts that, if proved, would overcome the individual defendant's immunity defense; complaints containing conclusory allegations, absent reference to material facts, will not survive motions to dismiss." *Geter v. Fortenberry*, 849 F. 2d 1550, 1553

(5th Cir. 1988); *see also Streetman v. Jordan*, 918 F.2d 555, 557 (5th Cir. 1990) ("Mere conclusory allegations and bold assertions are insufficient to meet this heightened standard.").

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft*, 563 U.S. at 735 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts have discretion to decide which of these two prongs to address first, and they should "think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" *Id.* (quoting *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009)). An official's "conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). While a plaintiff need not present a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Its protection "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S.

335, 341 (1986). Intent is not a factor when considering whether qualified immunity applies, in that "under the *Harlow* standard… an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Id.*

Thus, "[w]hether a defendant asserting qualified immunity may be personally liable turns on the objective reasonableness of the defendant's actions assessed in light of clearly established law." *Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (citing *Anderson*, 483 U.S. at 639). When assessing a defendant's conduct within the context of qualified immunity, a court "need not determine whether an actual constitutional violation occurred," but rather whether the defendant's conduct "was unreasonable in the light of clearly established law." *Griggs*, 841 F.3d at 315. "[I]f officers of reasonable competence could disagree" on the underlying issue at the heart of a qualified immunity case, then the protection should apply. *Malley*, 475 U.S. at 341. Moreover, since qualified immunity is a protection from suit rather than a mere protection from liability, courts have repeated stressed that immunity questions be resolved at the earliest opportunity. *Id.* at 231-232.

The qualified-immunity standard also "gives ample room for mistaken judgments." *Malley*, 475 U.S. at 343. While an officer's "actions may not have been as restrained as we would like to expect from model police conduct… qualified immunity 'protect[s] officers from the sometimes hazy border between excessive and acceptable force.'" *Griggs*, 841 F.3d at 315 (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *see also Graham v. Connor*, 490 U.S. 386, 396-97 (1989) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

### C. Excessive Force and Bystander Liability

To succeed on an excessive force claim, a plaintiff must demonstrate that (1) they were seized, (2) suffered an injury that (3) directly resulted from the allegedly excessive force, and (4) the force was objectively unreasonable. *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). Determining reasonableness in this context involves balancing the amount of force used and the need to exert said force. *Id.*

"In excessive force cases, 'the second prong of the [qualified immunity] analysis is better understood as two separate inquiries: whether the allegedly violated constitutional rights were clearly established at the time of the incident; and, if so, whether the conduct of the defendants was objectively unreasonable in light of that then clearly established law.'" *Griggs*, 841 F.3d at 313 (5th Cir. 2016) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 750 (5th Cir. 2005)). "The inquiry is 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Griggs*, 841 F.3d at 312 (5th Cir. 2016) (quoting *Graham*, 490 U.S. at 398). This inquiry is to be performed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). Some amount of force does not automatically equate to a constitutional violation. *Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Properly applying the test of reasonableness under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." *Id.* "Any force found to be objectively unreasonable exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

"A court must measure the force used under the facts as a reasonable officer *would perceive them*, not necessarily against the historical facts." *Griggs*, 841 F.3d at 313 (citing *Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009) (emphasis in original). "For that reason, when reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts." *Hill v. Carroll Cty., Miss.*, 587 F.3d 230, 234 (5th Cir. 2009).

"[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). To succeed on a claim of a failure to intervene and prevent the use of excessive force against a plaintiff, it is axiomatic that there must be an underlying excessive force violation of the plaintiff's Eighth Amendment rights. *Davis v. Cannon*, 91 Fed. Appx. 327, 329 (5th Cir. 2004). It is similarly axiomatic that to be held liable, a defendant must fail to take *reasonable* measures to prevent the use of excessive force, indicating that a defendant must know or should have known about the allegedly unconstitutional behavior and have both the time and capability to intervene. *Whitley v. Hanna*, 726 F.3d. 631, 646 (5th Cir. 2013). "[A]n officer may be liable under § 1983 under a theory of bystander liability where the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.*

### III.    Analysis

As noted above, we take the Plaintiff's factual statement of events as true, and he bears the burden of proof both as to the issue of summary judgment and as to refuting the defense of qualified immunity.   While this case as a whole presents several issues, this motion for summary judgment pertains strictly to the causes of action against Defendant Myrick that were expressed in the Plaintiff's Complaint.   Any other potential or actual causes of action were not well-plead in the Complaint, and must be disregarded.   *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)).   Thus, the only cause action against Defendant Myrick is Count IV of the Plaintiff's Complaint, namely a claim for failure to intervene [1, at 11].   However, as noted above, for a plaintiff to advance a successful failure to intervene claim, there must be an underlying violation of the plaintiff's rights. Consequently, the Court first addresses the Plaintiff's underlying excessive force claim against Defendant Mathews.

#### A.  The Plaintiff's Excessive Force Claim Against Defendant Mathews

Within the context of the Plaintiff's excessive force claim, this case could effectively be summarized as a "he said/he said" situation. The Plaintiff has stated under oath through depositional testimony and an affidavit that he was non-combative toward the Defendants, and did not refuse to follow their instructions [75-1, at 138-139; 75-4]. Moreover, he has stated that he did not even see or hear the Defendants until only a moment before Defendant Mathews used a taser on him suddenly and without warning [1 at ¶ 17; 75-1, at 123-25]. In contrast, Defendant Myrick has stated during depositional testimony that both Defendants spoke to and engaged the Plaintiff for some time before the use of the taser [75-5, at 50-63]. He also stated that the Plaintiff refused to follow their instructions, behaved in a belligerent manner toward the Defendants, made a number of antagonistic statements toward them, moved away from them toward a dimly lit area, opened his vehicle, entered it, and then exited it, all before the use of the taser [*Id.*].

14

At the summary judgment stage, the Court does not weigh credibility, and must view the facts and inferences in favor of the Plaintiff. Under the Plaintiff's version of the facts, he was tased with neither warning nor provocation, did not behave in a combative or non-communicative manner toward the Defendants, and did not resist or refuse their orders [75-1]. Consequently, under these facts, the use of a taser would be unwarranted and constitutionally prohibited. *Joseph v. Bartlett*, 981 F.3d 319, 342 (5th Cir. 2020); *Tayor v. Hartley*, 488 F. Supp 3. 517, 534 (S.D. Tex. 2020). Confined by the rule, the Court accepts, for the purpose of this motion, that the Plaintiff has made a colorable argument for an excessive force claim against Defendant Mathews, thus establishing the requirement of an underlying violation necessary for carrying forward a failure to intervene claim.

**B. The Plaintiff's Failure to Intervene/Bystander Liability Claim Against Defendant Myrick**

As noted above, to establish liability under a theory of bystander liability, a plaintiff must demonstrate that an officer knew that another officer was violating an individual's constitutional rights, had a reasonable opportunity to prevent the harm caused by this violation, and yet chose not to act. *Whitley*, 726 F.3d. at 646. Here is where the Plaintiff's case falls apart. He has failed to demonstrate sufficient evidence in the record that Defendant Myrick knew, *at the time of the incident*, that Defendant Mathews was violating the Plaintiff's right to be free of excessive force. Even if this were not so, the Plaintiff has conclusively failed to present any evidence that Defendant Myrick had a reasonable opportunity to prevent the harm caused by any alleged violation committed by Defendant Mathews. It is undisputed that the use of the taser occurred over the span of a few seconds. Moreover, Defendant Myrick has testified that his attention was not on the Plaintiff, but rather Kenneth Haywood, and the Plaintiff has failed to provide evidence to refute

this statement. In fact, when asked directly what more Defendant Myrick could do to prevent the harm, the Plaintiff failed to provide any answer, much less an explanation of a reasonable opportunity for Defendant Myrick on which he chose not to act. Similarly, the Plaintiff has failed to present any case law to support the contention that an officer focused on a second person of interest and with no foreknowledge of a second officer's actions toward a plaintiff would somehow have the ability to step into a seconds-long confrontation between the plaintiff and the second officer, much less have the obligation to do so, rather than trust at that moment in the discretion and professionalism of the second officer. Such a scenario simply does not meet the definition of a "reasonable opportunity" to prevent harm. It is for this reason that Plaintiff's failure to intervene claim against Defendant Myrick falls short and must be dismissed. Additionally, the Court notes that even if this were not so, the Plaintiff has failed to show how qualified immunity would not be applicable with regard to Defendant Myrick, and how any supposed seconds-long failure on the part of Defendant Myrick would constitute a clearly established constitutional violation.

### IV.    Conclusion

For the above-stated reasons, the Court finds that the Plaintiff has failed to present evidence of a genuine issue of material fact with regard to his failure to intervene claim against Defendant Myrick, and likewise failed to articulate any reason why qualified immunity would not apply with respect to Defendant Myrick. Therefore, the Court finds that Defendant Myrick's Motion for Summary Judgment [70] is well-taken, and shall be granted.

An order in accordance with this opinion shall issue this day.

THIS, the _10th_ day of August, 2021.

_____
SENIOR U.S. DISTRICT JUDGE

16